**BRAGAR EAGEL & SQUIRE, P.C.**
W. Scott Holleman (SBN 310266)
Melissa A. Fortunato (SBN 319767)
101 California Street, Suite 2710
San Francisco, California 94111
Telephone: (415) 365-7149
Email: holleman@bespc.com
         fortunato@bespc.com

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NOTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEAU ENGLISH, Derivatively on Behalf of GRANITE CONSTRUCTION INCORPORATED,<br><br>                          Plaintiff,<br><br>          v.<br><br>JAMES ROBERTS, JIGISHA DESAI, LAUREL J. KRZEMINSKI, CLAES G. BJORK, PATRICIA D. GALLOWAY, ALAN P. KRUSI, JEFFREY J. LYASH, GADDI H. VASQUEZ, DAVID C. DARNELL, CELESTE B. MASTIN, DAVID H. KELSEY, JAMES W. BRADFORD, JR., MOLLY CAMPBELL, and MICHAEL F. MCNALLY,<br><br>                          Defendants,<br><br>          -and-<br><br>GRANITE CONSTRUCTION INCORPORATED,<br><br>                          Nominal Defendant. | Case No.<br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Beau English ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which included a review and analysis of, among other things: (a) Granite Construction Incorporated's ("Granite" or the "Company") filings with the U.S. Securities and Exchange Commission ("SEC"); (b) Granite's press releases, website pages, corporate governance documents, presentations, conference calls, and other publicly disseminated information; (c) analyst reports, public records, and other publicly available information concerning Granite; and (d) the pleadings filed in a federal securities class action captioned as *Greene v. Granite Construction Inc.*, Case No. 4:19-cv-4744-WHA (N.D. Cal.) ("Securities Class Action").

## NATURE OF THE ACTION

1.      This is a stockholder derivative action asserting claims for breach of fiduciary duty, unjust enrichment, and violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") during April 30, 2018 through October 24, 2019 ("Relevant Period") brought on behalf of nominal defendant Granite against certain current and former officers and members of the Company's Board of Directors ("Board").

2.      Granite is a construction company that builds large infrastructure projects.  Granite bids and completes both public and private projects including building streets, roads, highways, and bridges.

3.      At issue in this derivative action are the Company's four largest "mega projects," which were worth more than $7.5 billion: (1) Florida I-4 Ultimate Improvement Project (the "I-4 Project"); (2) New York Tappan Zee Bridge Hudson River Crossing Project (the "Tappan Zee Project"); (3) Pennsylvania Department of Transportation ("PennDOT")Rapid Bridge Replacement Project (the "Rapid Bridge Project"); and (4) Texas IH 35 E Managed Lanes Project (the "IH 35 Project," and, collectively with the I-4 Project, the Tappan Zee Project, and the Rapid Bridge Project, the "Projects").

4.      Granite won the Projects on a fixed price basis with extremely limited options to obtain additional compensation in unanticipated situations such as delays, cost overruns, or inefficiencies.  Thus, the Company assumed a high risk of having no viable mechanism to make up for cost overruns.

5.      The Company used the percentage-of-completion method for accounting for the Projects, which compares the costs incurred at a specific point in time to the total costs to complete the project to calculate a percentage.  The Company then used this percentage to recognize the revenues and profits.  Because the percentage method is critical to recognizing profits, Generally Accepted Accounting Principles ("GAAP") mandates that companies include all costs in the percentage calculation immediately.  Nevertheless, the Individual Defendants (defined herein) intentionally excluded known costs from the percentage calculation, thereby inflating the Company's revenues and profits by hundreds of millions of dollars.

6.      Further, the Individual Defendants assured investors and the public that the Company was properly accounting for problems and setbacks with the Projects and that the Company was shifting its business to smaller and less risky projects.

7.      During the Relevant Period, the Individual Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts, about the Company's business, operations, and prospects.  Specifically, the Individual Defendants knowingly inflated the Company's revenue, income, and margins in violation of GAAP, which rendered Granite's financial results issued during the Relevant Period materially false and misleading.

8.      While Granite's stock price was artificially inflated because of the fraud, the Individual Defendants also caused the Company to carry out a previously announced but dormant stock repurchase plan.  As detailed below, the Individual Defendants caused Granite to buy back its own shares on the open market at prices that far exceeded the Company's intrinsic value, thus depleting the Company's assets for the Individual Defendants' personal gain.

9.      The Individual Defendants breached their fiduciary duties of loyalty and good faith and committed other violations of law by willfully engaging in the wrongdoing as alleged herein.

3

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

10.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, Granite has sustained damages as described below.

### JURISDICTION AND VENUE

11.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the Complaint raises a federal question under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and 78t-1), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.  This Court has exclusive jurisdiction over the federal securities laws claims under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims form part of the same case or controversy.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

12.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who resides in this District or has sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because nominal party Granite maintains its principal executive offices in this District, one or more of the defendants either resides in or maintains offices in this District, a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein and violation of fiduciary duties owed to Granite occurred in this District, and/or defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

### PARTIES

14.     Plaintiff is a stockholder of Granite, was a stockholder of Granite at the time of the wrongdoing alleged herein, and has been a stockholder of Granite continuously since that time

15.     Defendant Granite is incorporated under the laws of Delaware with its principal executive offices located in Watsonville, California.  Granite's common stock trades on the New York Stock Exchange under the symbol  "GVA."

16.     Defendant James H. Roberts ("Roberts") has served as the Company's President and Chief Executive Officer ("CEO") since September 2010 and as a member of the Company's Board since 2011.  He also served as the Company's Executive Vice President and Chief Operating Officer from September 2009 to August 2010, Senior Vice President from May 2004 to September 2009, Granite West Manager from February 2007 to September 2009, Branch Division Manager from May 2004 to February 2007, Vice President and Assistant Branch Division Manager from 1999 to 2004, and Regional Manager of Nevada and Utah Operations from 1995 to 1999.  In the Company's most recent annual proxy statement, the Company listed as one of his purported qualifications Roberts's "insider's perspective of the Company's day-to-day operations and the strategic direction of the Company . . . ."  Defendant Roberts is named as a defendant in the Securities Class Action. According to the Company's public filings, defendant Roberts received $4,126,623 in 2018 in compensation from the Company.

17.     Defendant Laurel J. Krzeminski ("Krzeminski") served as the Company's Executive Vice President and Chief Financial Officer ("CFO") between June 2010 and July 2018.  Defendant Krzeminski is named as a defendant in the Securities Class Action.  According to the Company's public filings, defendant Krzeminski received $1,284,853 in 2018 in compensation from the Company.

18.     Defendant Jigisha Desai ("Desai") has served as the Company's Senior Vice President and CFO since July 2018.  Defendant Desai is named as a defendant in the Securities Class Action.  According to the Company's public filings, defendant Desai received $636,218 in 2018 in compensation from the Company.

19.     Defendant Claes G. Bjork ("Bjork") has served as a member of the Company's Board since 2006.  According to the Company's public filings, defendant Bjork received $337,802 in 2018 in compensation from the Company.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

20.     Defendant Patricia D. Galloway ("Galloway") has served as a member of the Company's Board since 2017.  Defendant Galloway also served as a member of the Company's Audit/Compliance Committee (the "Audit Committee") during the Relevant Period.  Galloway has a history of neglecting her duties as a director of publicly traded corporations.  Specifically, Galloway served on the board of directors of SCANA Corporation ("SCANA"), a South Carolina-based utility, which has been embroiled in litigation arising out of a horribly mismanaged nuclear project and subsequent merger with Dominion Energy, Inc.  Galloway chaired a special litigation committee that attempted to shut down shareholder litigation against SCANA's officers and directors, even after a motion to dismiss had already been denied, but a court rejected Galloway's meddling attempts.  According to the Company's public filings, defendant Galloway received $215,986 in 2018 in compensation from the Company.

21.     Defendant Alan P. Krusi ("Krusi") has served as a member of the Company's Board since 2018.  According to the Company's public filings, defendant Krusi received $165,084 in 2018 in compensation from the Company.

22.     Defendant J. Lyash ("Lyash") has served as a member of the Company's Board since 2018.  Defendant Lyash also served as member of the Audit Committee during the Relevant Period.  According to the Company's public filings, defendant Lyash received $172,359 in 2018 in compensation from the Company.

23.     Defendant Gaddi H. Vasquez ("Vasquez") has served as a member of the Company's Board since 2012.  Apart from Granite, Vasquez served for many years as a high-level executive for Edison International and Southern California Edison, a public utilities company that caused some of the largest wildfires California has ever seen.  Vasquez also divides his time by sitting on numerous other boards.  According to the Company's public filings, defendant Vasquez received $223,233 in 2018 in compensation from the Company.

24.     Defendant David C. Darnell ("Darnell") has served as a member of the Company's Board since 2017.  Defendant Darnell also served as a member of the Audit Committee during the

1  Relevant Period.  According to the Company's public filings, defendant Darnell received $215,986

2  in 2018 in compensation from the Company.

3        25.     Defendant Celeste B. Mastin ("Mastin") has served as a member of the Company's

4  Board since 2017.  According to the Company's public filings, defendant Mastin received $216,986

5  in 2018 in compensation from the Company.

6        26.     Defendant David H. Kelsey ("Kelsey") has served as a member of the Company's

7  Board since 2003.  Defendant Kelsey also served as Chair of the Audit Committee during the

8  Relevant Period.  According to the Company's public filings, defendant Kelsey received $240,111

9  in 2018 in compensation from the Company.

10        27.     Defendant James W. Bradford, Jr. ("Bradford") has served as a member of the

11  Company's Board since 2006.  Defendant Bradford also served as a member of the Audit Committee

12  during the Relevant Period.  According to the Company's public filings, defendant Bradford

13  received $240,212 in 2018 in compensation from the Company.

14        28.     Defendant Molly Campbell ("Campbell") has served as a member of the Company's

15  Board since June 2019.  Defendant Campbell also served as a member of the Audit Committee

16  during the Relevant Period.

17        29.     Defendant Michael F. McNally ("McNally") has served as a member of the

18  Company's Board since 2016.  According to the Company's public filings, defendant McNally

19  received $228,089 in 2018 in compensation from the Company.

20        30.     Defendants Roberts, Bjork, Galloway, Krusi, Lyash, Vasquez, Darnell, Mastin,

21  Kelsey, Bradford, Campbell, and McNally are sometimes referred to herein as the "Director

22  Defendants."

23        31.     Defendants Kelsey, Bradford, Darnell, Galloway, Campbell, and Lyash are

24  sometimes referred to herein as the "Audit Committee Defendants."

25        32.     Defendants Roberts, Desai, Krzeminski, Bjork, Galloway, Krusi, Lyash, Vasquez,

26  Darnell, Mastin, Kelsey, Bradford, Campbell, and McNally are sometimes referred to herein as the

27  "Individual Defendants."

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## DUTIES OF THE INDIVIDUAL DEFENDANTS

33.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

34.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

35.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Granite were required to, among other things:

> a.     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;
>
> b.     conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;
>
> c.     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

d.   remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e.   ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

36.   Each of the Individual Defendants, as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

37.   The Company has established a Code of Business Conduct (the "Code"), which applies to all employees and directors of the Company.  The Code states:

Accounting rules are important to any business that must report financial results to those outside the Company, which can include banks, bonding companies, and regulatory agencies. Likewise, investors in publicly traded companies make their assessments on the assumption that companies follow a uniform set of standards. Granite follows Generally Accepted Accounting Principles.

*     *     *

All who act for the Company must comply with applicable federal, state, and local laws, rules, and regulations.

*     *     *

**Accounting and Financial Disclosures**

• All directors, officers, and employees must act in good faith, responsibly, with due care, competence, and diligence, without misrepresenting material facts or allowing their independent judgment to be subordinated.

• All funds must be properly recorded on Company books and records.

• All information disclosed in our public reports, including those filed with the Securities and Exchange Commission, will be full, fair, accurate, timely, and understandable.

• The Company will comply with the rules and regulations of federal, state, and local governments and other appropriate private and public regulatory agencies.

\*        \*        \*

**Managing Company Records**

• Maintaining records is essential to our work, and care must be taken to ensure that records are managed properly. These principles should guide us to:

• Maintain records specifically required by law. Some laws have specific record-keeping requirements, and we must faithfully maintain all records required by law.

• Be alert to the need for accuracy–especially when documents are produced for an official purpose. Employees should always try to ensure the accuracy of records, but this becomes especially important when documents are produced for an official purpose, such as litigation or a government inquiry. Providing false or misleading records is wrong under any circumstances– and doing so when records are produced or maintained for official purposes is a serious violation of law.

• Retain any records related to litigation or an investigation. If there is an investigation or litigation or one is anticipated, it is essential to retain any and all related records.

• Keep only what is required under our record retention policies. Although accurate records must be maintained, every business needs an orderly process for retaining them. Consult the Records Retention Policy in the Granite Management System to ensure that we do not retain unnecessary documents.

38.     The Board also maintains a Board of Directors Corporate Governance Guidelines and Policies, which requires the Director Defendants to "Assist[] management in the oversight of compliance by the Company with applicable laws and regulations, including in connection with the public reporting obligations of the Company."

39.     Furthermore, pursuant to the Board's Audit Committee Charter, the purpose of the Audit Committee (and the Audit Committee Defendants) is to assist the Board in fulfilling its responsibilities for generally overseeing:

(1) the Company's accounting and financial reporting principles and policies and internal controls and procedures, including the internal audit function,

(2) the Company's system of Internal Control over financial reporting as required by Section 404 of the Sarbanes-Oxley Act of 2002,

(3) the integrity of the Company's financial statements,

(4) the qualifications and independence of the Company's independent auditor,

(5) the Company's compliance with legal and regulatory requirements, and

(6) the Company's Corporate Compliance Program and Code of Conduct.

40.     The Audit Committee Charter states that the Audit Committee is responsible for oversight over the following functions:

> The function of the [Audit] Committee is oversight.  The management of the Company is responsible for the preparation, presentation and integrity of the Company's financial statements.  Management is responsible for maintaining appropriate accounting and financial reporting principles, policies, internal controls and procedures designed to assure compliance with accounting standards and applicable laws and regulations.  The independent auditor is responsible for planning and carrying out a proper audit of the Company's annual financial statements and internal control over financial reporting, reviews of the Company's quarterly financial statements prior to the filing of each quarterly report on Form 10-Q, and other procedures.

41.     As described below, the Audit Committee failed to oversee these responsibilities.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

42.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the truth and further aided and abetted and assisted each other in breaching their respective duties.

43.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to:   (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of Sections 10(b) and 20(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, and future business prospects; (iii) artificially inflate the Company's stock price; and (iv) enhance the Individual Defendants' Company positions and their profits and power stemming from such positions.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

44.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company to purposefully or recklessly conceal material facts, fail to correct such misrepresentations, and violate applicable laws.  The actions described herein occurred under the authority of the Board, thus each of the Individual Defendants who are directors of Granite was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

45.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of wrongdoing, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

46.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Granite and was at all times acting within the course and scope of such agency.

## SUBSTANTIVE ALLEGATIONS

**COMPANY BACKGROUND**

47.     Granite specializes in both public and private sector transportation infrastructure projects that include roads, highways, tunnels, bridges, locks and dams, mass transit facilities, and airports.

48.     Following the financial crisis that devasted private construction projects, by late 2011 the Company, under the leadership of defendant Roberts, began pursuing public fixed-price "mega projects."  To that end, the Company began aggressively bidding on and eventually winning a series of mega projects valued at over $7.5 billion.

49.     The Individual Defendants touted the Company's pursuit of public mega projects. For example, in a Form 10-K filed on March 3, 2014, Roberts emphasized the significant "opportunities" presented by "three Large Projects [later four] that helped us reach a record backlog

of $2.5 billion, up 48 percent from $1.7 billion in 2012." The $2.5 billion "backlog" referred to work that Granite had yet to complete and would be booked as revenue once completed.

50.     Each of the Projects involved a fixed-price contract between the joint venture partners and the relevant state transportation authority. In a fixed-price contract arrangement, companies agree on a set price for the contracted services at the outset of a project. Because the price is fixed and does not depend on the resources used or time expended, the risk of any cost overruns or delays compared to the initial cost estimate is borne by the companies. As such, the profitability of a fixed-price contract depends on the companies' ability to manage costs and efficiently perform the work.

51.     Pursuant to the fixed-price nature of the contracts, the Projects required Granite to perform and satisfy client demands prior to any determination of whether the demands were included within the scope of work. As defendant Roberts explained on an August 2, 2019 conference call, Granite is "contractually obligated to continue work on the jobs, and to recognize the associated costs regardless of whether we agree that the work we have been directed to perform is within the scope of our contracts." Further, the fixed-price contract arrangement limited the Company's ability to recover cost overruns, shifting cost overrun risks from state public authorities to Granite and its joint venture partners. Also, because the Projects were integrated joint ventures, the Company's financial interest in the Projects was tied to its ownership stake in each Project.

52.     Due to the fixed-price contract arrangement, Granite assumed significant risk by pursuing the Projects. Despite these significant levels of risk, Granite and its joint venture partners submitted extremely aggressive bids, underbidding competitors by $1 billion for the Tappan Zee Project and $860 million on the I-4 Project. These two projects are at the center of the Individual Defendants' accounting fraud.

53.     On April 24, 2014, Granite announced that the Florida Department of Transportation ("FDOT") had selected the Company, together with Skanska AB ("Skanska") and the Lane Construction Company ("Lane"), to lead the I-4 Project. Granite's joint venture for the I-4 Project

was named "SGL Constructors."[1]  For a price of $2.3 billion, SGL Constructors agreed to design and build 21 miles of I-4 interstate highway in Orlando.  This included reconstructing 15 major interchanges, building over 140 bridges, adding four toll lanes, and completely rebuilding the general use lanes along the entire I-4 corridor.  Currently, the project is roughly 70% complete.  Granite has a 30% equity interest in the I-4 Project.

54.    On December 17, 2012, Granite announced that the New York State Thruway Authority ("NYSTA") had awarded a $3.14 billion design-build[2] contract for the Tappan Zee Project to Tappan Zee Constructors ("TZC").  The members of the TZC joint venture are Granite, Fluor Corporation, American Bridge Company, and Traylor Bros., Inc.  The Tappan Zee Project would replace the 3.1-mile-long Tappan Zee Bridge, which connects Rockland and Westchester Counties in New York, and was expected to be completed in 2017.  While the new bridge has opened, work continues to this day.  Granite has a 23.3% equity interest in the Tappan Zee Project.

55.    On October 27, 2014, Granite announced that PennDOT had selected Granite's joint venture team for the Rapid Bridge Project for a total price of $1.1 billion.  The members of the joint venture, named "Plenary Walsh Keystone Partners," are Granite, HDR Engineering, The Plenary Group, and The Walsh Group ("Walsh"). Granite and Walsh serve as the design-build contractor on the project ("Granite/Walsh JV").   Under the terms of the contract, Granite and Walsh were responsible for replacing 558 structurally deficient bridges across Pennsylvania.  Granite has a 40% interest in the Rapid Bridge Project.

56.    On December 13, 2012, Granite announced that the Texas Department of Transportation had selected the joint venture formed by Granite, Archer Western Contractors, and

---

[1] SGL Constructors, which is charged with building the I-4 Project, is part of a broader team on the I-4 Project named I-4 Mobility Partners.  Through the I-4 Project in Florida, SGL Constructors was to design and build 21 miles of I-4 highway.  I-4 Mobility Partners is the concessionaire for the project and responsible for designing, financing, maintaining, and operating the I-4 Project.  I-4 Mobility Partners is jointly owned by Skanska and John Laing.

[2]  Design-build is a project delivery method in which the design and construction services are contracted by a single entity.

Lane, named "AGL Constructors," to rebuild 28.2 miles of highway in Texas at a price of $1.2 billion.  Granite has a 35% interest in the IH 35 Project.

**THE INDIVIDUAL DEFENDANTS' ACCOUNTING FRAUD TO INFLATE THE COMPANY'S REVENUE AND PROFIT FIGURES**

57.   During the Relevant Period, the Individual Defendants claimed to recognize revenue from each of the Projects under an accounting method known as "percentage of completion."  Under the GAAP percentage of completion method, revenue is reached by dividing actual costs by the total estimated costs, then applying that percentage to the total transaction price.

58.   The Individual Defendants manipulated both the Projects' transaction prices and percentages of completion, which in turn overstated Granite's revenue and profit figures during the Relevant Period.

59.   For each of the Projects, one of the joint venture partners would be designated as a sponsor, who would provide all administrative and accounting support for the project.  Granite did not serve as a sponsor for any of the Projects, so Granite received detailed financial statements directly from the sponsoring partners from each of the Projects.

60.   The financial statements were prepared in accordance with governing accounting standards and were audited.  Receiving the financial statements from one sponsor ensured that all participants in each joint venture, including Granite, received consistent information about the project's progress towards completion so that each partner could appropriately account for the project's revenues, costs, and profits.

61.   The Projects were highly material to Granite's financial statements.  Granite's financial statements disclosed the aggregate financial results of the Projects as "unconsolidated joint ventures."  Such large projects with unconsolidated joint ventures had contracts with a combined value of $11.5 billion, of which Granite's share was $3.3 billion (as of September 30, 2019), and contributed up to 17.5% of Granite's overall trailing twelve months ("TTM") revenue during the Relevant Period.   Specifically, the Projects comprised the overwhelming majority of Granite's

unconsolidated joint ventures, with a total contract value of $7.5 billion, of which Granite's share was $2.3 billion.

62.     From early on, the Projects incurred cost overruns and delays.  More importantly, the Individual Defendants did not disclose the effect of the cost overruns on Granite's financial statements.  Thus, the specific accounting determination as to costs and revenue for each Project was concealed from investors.  For example, by March 2018, news outlets reported that Granite and TZC were contemplating bringing a $900 million claim against the NYSTA relating to cost overruns and scheduling delays.  However, the NYSTA specifically denied that any valid claim existed and emphasized that all invoices from TZC to date had been fully paid.  The disclosure of a potential claim of approximately $900 million by the joint venture in no way revealed Granite's accounting treatment with respect to the claim, or the revenues and costs Granite booked for the Tappan Zee Project.  Investors and the public had no way of knowing that Granite had not properly incorporated the cost overruns and $900 million claim into the Company's accounting.

63.     To hide the impact of the cost overruns of the Projects, the Company sought to enter into a merger transaction.  On February 14, 2018, the Individual Defendants caused the Company to announce the acquisition of Layne Christensen Company ("Layne"), a water management, construction, and drilling company, in a $565 million stock-for-stock merger transaction.  The Layne acquisition involved granting Layne shareholders $376 million in Granite stock and Granite assumed $189 million in Layne debt.  As a result of the Layne acquisition, Granite expanded into water and wastewater infrastructure.  After the acquisition, Layne represented 14% of the Company's pro forma revenues—compared to 30% from Large Project Construction, down from 35% prior to the acquisition—diluting the Company's revenue concentration in the Projects.

64.     Following the announcement of the Layne acquisition, the Individual Defendants falsely claimed that the financial results of the Projects were improving.  In announcing the Company's financial and operational results for the first quarter of 2018, on April 30, 2018, the Individual Defendants represented that Large Project Construction revenue increased 20% over the

prior year, gross profit increased by approximately 800%, and the profit margin increased to 8.2% from 1.2% the prior year.

65.     In a conference call held with investors and analysts on April 30, 2018, defendant Roberts attributed the positive financial results to the fact that "work on underperforming, mature projects [*i.e.*, the Projects] had less impact" on the Company's business and that a "strong ramp-up of activity at newer projects . . . mitigat[ed] some of the continued negative impact from challenging projects."  In the same call, defendant Krzeminski, in support of Roberts' statement, stated that the improvement in Granite's Large Project Construction segment was the result of "a reduced pace of mature underperforming projects, which lessened their drag on quarterly results."  Krzeminski also emphasized the Company's "consistent cost control" as a source of its financial improvement.

66.     The Individual Defendants continued to assure the public that the Company did not need to take a charge on the Projects despite incurring significant losses.  For example, on May 1, 2018, the Individual Defendants caused the Company to file a Form 10-Q with the SEC that stated that the Company realized net income from the unconsolidated joint ventures of $2.6 million for the three months ended March 31, 2018, even though the joint ventures for the Projects incurred a net loss of $141 million during that period.  The Individual Defendants stated that this was due to "differences between our estimated total revenue and cost of revenue when compared to that of our partners," without providing sufficient explanation.  The Individual Defendants further assured investors in the same 10-Q that the Projects' costs underlying the reported financial results were "materially reliable" and stemmed from a detailed "bottom up" approach imbued with the Company's experience.

67.     Analysts and investors responded positively to the Individual Defendants' representations.  For example, an analyst with Canaccord Genuity stated in a report on April 30, 2018 that Granite's "core business continues to improve," as is "the qualitative outlook [] for large projects."  Canaccord Genuity specifically noted that "challenged large projects were a significant drag to 2017 results" and that it was encouraged by Granite's "significant improvements in Large Project segment margins," as well as "the benefit from the completion of challenged large projects

in the first half" of 2018.  Other analysts, including Macquarie Research and Cowen, published similar outlooks in their reports.

68.     Despite the Individual Defendants' assurances, in reality, the Company's financial statements were not accurate and failed to properly account for massive cost overruns in violation of GAAP.  By April 30, 2018, the I-4 Project, Tappan Zee Project, Rapid Bridge Project, and IH 35 Project had experienced cost overruns of $100 million, $900 million, $340 million, and $25 million, respectively.

69.     On June 28, 2018, Moody's reported that I-4 Mobility had filed a claim on June 11, 2018 with the FDOT for $100 million in additional compensation to attempt to recoup cost overruns arising from a 245-day time delay.  The Moody's report was the first public indication of this claim, which Granite has never publicly disclosed.  Despite the public report, investors had no way of knowing how this claim was reflected in Granite's financial statements, or whether Granite had included those cost overruns or disputed costs in its calculation of revenue and percentage of completion of the I-4 Project.

70.     On June 11, 2018, I-4 Mobility sent a letter to the FDOT asserting that the FDOT owed "$100,393,430 in additional compensation and a 245 Day Time Extension related to impacts arising from the drilled shaft failure and second drilled shaft failure in Area 2."  The letter explained that the "drilled shaft failures and the impacts of those failures are more fully detailed in the enclosed submission from the design-build contractor, SGL Constructors," and that the overall claim for $100 million and a 245-day extension included "requests for relief for Concessionaire-Related Entities SGL Constructors, as the Design-Build Contractor."

71.     The June 11, 2018 letter had questionable explanations.  The letter attributed the eight-month delay and $100 million in additional costs to discrete drilling issues despite having reported that, in September 2017, "[d]elays associated with the drilled shaft failures were substantially mitigated by a redesign."  Thus, the Individual Defendants knew that the Company would have a very low likelihood of receiving the $100 million requested for cost overruns.

72.     Indeed, on October 18, 2018, Skanska, the majority partner on the I-4 Project, announced that it would take a $100 million charge on two public-private partnerships in the U.S. due to lower production rates and delays.  While Skanska did not publicly reference the I-4 Project, its only two substantial public-private partnership projects in the U.S. are the I-4 Project and some work at New York's LaGuardia Airport.  Skanska simultaneously announced that the head of its civil engineering business in the U.S. would step down immediately and that the company would no longer bid on large public-private partnership projects in the U.S.

73.     Despite the fact that Skanska, Granite's majority partner for the I-4 Project, booked its charge relating to the I-4 Project, Granite did not recognize a charge.  On October 29, 2018, eleven days after Skanska booked its charge, the Individual Defendants caused the Company to file a Form 10-Q with the SEC stating that Granite did not need to recognize a charge.  The Individual Defendants insisted that the Company was different from its joint venture partners by announcing that Granite recognized $3.1 million and $16.5 million in net losses during the three and nine months ended September 30, 2018.  In contrast, the joint venture recognized $47.6 million and $162 million in net losses during the three and nine months ended September 30, 2018.  Further, the Individual Defendants stated that, as of September 30, 2018, there were only four projects for which additional costs were reasonably possible, and that the aggregate range of additional costs was "zero to $45.0 million."

74.     Granite also incurred cost overruns on the Tappan Zee Project.  Indeed, TZC, the joint venture which Granite was a member of, submitted a Freedom of Information Law request to NYSTA seeking documents regarding disputed costs, including documents regarding "NYSTA's Project 'Oversight' role"; "[d]iffering site conditions encountered by TZC"; "[p]ile inspection, testing and welding criteria directed by NYSTA"; "[n]oise shrouds and bubble curtains required by NYSTA"; a "marine incident" on March 12, 2016; a "crane incident" on July 19, 2016; several weather events in January, October, and November 2014; the overall "impact of weather on the project schedule" from 2014 to 2018; and "[c]hanges with respect to demolition of the existing Tappan Zee Bridge."  More importantly, the information request sought information regarding

1   TZC's "Dispute Submission with Demand for Payment dated March 15, 2018," which confirms that

2   the project had cost overruns.  The Individual Defendants did not specifically disclose these cost

3   overruns.  In March 2018, TZC filed a $900 million claim on the Tappan Zee Project to recover for

4   cost overruns.

5          75.    The Rapid Bridge Project, likewise, experienced significant cost overruns.  The

6   Granite/Walsh JV responsible for this Project internally admitted in an October 26, 2016

7   memorandum from Arik Quam ("Quam"), the Business Group Leader, that it "did not do enough to

8   price each bridge sites [sic] unique characteristics that would add costs to each bridge site—we

9   would not have been the selected bidder had we done this correctly."  The Granite/Walsh JV "[took]

10  for granted that these little bridges would not have issues and would get done on time."  And it

11  "[a]ccepted the risk of unforeseen conditions – Differing Site Conditions."

12         76.    Quam further explained that:  (i) the "plans and forms and processes were not fully

13  vetted" and the "Project Schedule is too complex and aggressive"; (ii) the Granite/Walsh JV "[d]id

14  not adjust to realistic durations until later in the project which affected prioritization on the

15  downstream activities"; (iii) according to PennDOT, the contract allowed "no change orders"

16  because it was "a lump sum contract with NO change orders"; (iv) a Pennsylvania official, "Deputy

17  Sec Ritzman[,] had told [the Granite/Walsh JV] that during the budgeting process [Ritzman] was

18  told not to budget anything for change orders"; and (v) the Granite/Walsh JV had experienced

19  "significant increases in construction costs, design cost," and "schedule duration" arising from

20  project modifications.

21         77.    Adding to cost overruns, the Rapid Bridge Project had liquidated damage provisions

22  that would be triggered by delays.  By August 2016, the Granite/Walsh JV knew that it faced

23  potential damages of $45 million that it would seek to pass along to the project's architect, HDR, by

24  withholding further payments to HDR.  On August 31, 2016, it sent HDR—copying Granite

25  executives Mike Donnino and Bob McTavish—a formal "Notice of Payment Withholding,"

26  asserting that the Granite/Walsh JV "has suffered substantial damages estimated in the amount of

27  $45M as a result of design related schedule delays and design quantity growth."

28

78.     In April 2017, the Granite/Walsh JV reached a settlement with PennDOT in which the Granite/Walsh JV recovered less than 23% of its $340 million in purported claims associated with overruns and schedule delays on the Rapid Bridge Project.

79.     Beginning with the fourth quarter of 2018, the quarter after Skanska recognized a $100 million charge, the Individual Defendants caused the company to remove "reasonably possible" additional costs in violation of GAAP.

80.     On a Form 10-Q filed with the SEC on May 1, 2018, the Company reported: "As of March 31, 2018, there were four projects for which additional costs were reasonably possible in excess of the probable amounts included in the cost forecast.  The reasonably possible aggregate range that has the potential to adversely impact gross profit during the year ended December 31, 2018 was zero to $47.0 million."

81.     On a Form 10-Q filed with the SEC on August 8, 2018, the Company reported: "As of March 31, 2018, there were four projects for which additional costs were reasonably possible in excess of the probable amounts included in the cost forecast.  The reasonably possible aggregate range that has the potential to adversely impact gross profit during the year ended December 31, 2018 was zero to $15.0 million."

82.     On a Form 10-Q filed on October 29, 2018, the Company reported:  "As of March 31, 2018, there were four projects for which additional costs were reasonably possible in excess of the probable amounts included in the cost forecast.  The reasonably possible aggregate range that has the potential to adversely impact gross profit during the year ended December 31, 2018 was zero to $45.0 million."

83.     However, the quarters after Skanska recognized a $100 million charge, in a Form 10-K dated February 16, 2019 and Forms 10-Q dated April 26, 2019 and August 6, 2019, the Individual Defendants caused the company to omit any "reasonably possible aggregate range" of additional costs, misleading investors that no charges were being considered.  This factually unwarranted removal of any "reasonably possible aggregate range" violates GAAP.

84.     Instead, on the Form 10-Q filed with the SEC on August 6, 2019, the Company took a charge of $143.7 million pre-tax that began to reveal the truth regarding the Individual Defendants' accounting fraud.  The $143.7 charge was a result of a $161.1 million reduction in gross profit for five projects, with the Projects accounting for $153.6 million.  This amount far exceeded any of Granite's publicly disclosed "reasonably possible" costs or charges in prior quarters and nearly doubled Granite's charges in the entirety of 2018.  The Company's next Form 10-Q filed with the SEC on October 25, 2019, revealed that the Company took another charge of $80.7 million resulting from increased costs and decreased gross profits for six projects.

85.     As a member of joint ventures, the Company reported its financial statements on an unconsolidated basis.  Typically, each design-build joint venture prepares its own financial statements, which are often audited by an outside firm.  For example, the PennDOT Agreement expressly required the relevant joint venture to provide financial statements prepared "using GAAP or equivalent accounting principles . . . and audited by an independent certified public accountant."

86.     The Company, as a member of integrated joint ventures, was provided with the financial statements of the joint ventures.  The Company was also provided with the joint monthly profit and loss statements.  Since Granite's financial interest in each of the Projects reflected its ownership stake in the entire associated project, GAAP required Granite to maintain consistent pro rata shares of the joint ventures' revenues, cost of revenue, and net income.

87.     Instead, Granite's accounting for its interests in the Projects deviated substantially from other joint venture partners and the joint ventures themselves.  Granite never explained the bases for any deviations other than to state that they existed.  During the Relevant Period, there was a significant discrepancy between the joint ventures' revenues, cost of revenue, and net income/net loss and Granite's purported pro rata share of those metrics.  This deviation in financial metrics underscores Granite's violations of GAAP.

88.     Specifically, Granite historically claimed about 30% of the joint ventures' revenue, which was generally in excess of $430 million per quarter from 2015 through 2017.  This changed when the joint ventures' revenue dropped to $239 million in the first quarter of 2018.  Suddenly, the

Company claimed 49% of that revenue, as compared to 30% historically.  Further, despite claiming 49% of the revenue, the cost of revenue percentage remained around 30%.  This disparity resulted in the joint ventures sustaining a $141 million loss in the first quarter of 2018, while Granite recorded a $2.6 million gain.

89.     Throughout the Relevant Period, the Individual Defendants continued to cause the Company to claim disproportionate shares of the joint ventures' income.  For 2018 as a whole, while the joint ventures recognized a total net loss of $240.3 million, the Company posted only a $22.6 million net loss.  Since the overall share of Granite in the joint ventures remained the same, the disparity has no viable explanation other than accounting fraud.  This accounting fraud was revealed in the second and third quarters of 2019, when the Company reported significant losses.

90.     One metric, net margin, displays the pattern clearly.  Net Margin reflects net income divided by total revenue, which depicts the percentage of profit or loss that the Company recognized on the Projects.  The metric also demonstrates the Company's "catch up" charges that the Company needed to take in the second and third quarters of 2019 and that the Individual Defendants caused the Company to inappropriately report net margin from the joint ventures from the first quarter of 2018 through the first quarter of 2019.

|  | 1Q18 | 2Q18 | 3Q18 | 4Q18 | 1Q19 | 2Q19 | 3Q19 |
|---|---|---|---|---|---|---|---|
| JV Net Margin | (4.7%) | (4.4%) | (9.4%) | (15.6%) | (5.5%) | (8.2%) | (6.6%) |
| Granite Net Margin From JVs | (2.3%) | (3.9%) | (3.2%) | (4.7%) | (4.9%) | (30.6%) | (43.6%) |

91.     The following chart shows that in the second quarter of 2019, Granite's TTM net margin for the joint ventures plummeted.



92.     Further, the chart below shows the longer-term trend of Granite's overstated cumulative margins relative to the joint ventures.



93.     The above facts illustrate that the Individual Defendants caused the Company to materially overstate revenues and profits during the Relevant Period, only to catch up on massive charges.   Further, during the Relevant Period, the Individual Defendants only made limited

disclosures about the joint ventures' financials, hiding the Company's overstatement of revenues and profits relative to its joint venture partners.

94.     Indeed, when CFRA Research first raised the disturbing discrepancy in Granite's joint venture accounting in July 2019, the Individual Defendants responded that, "This represents differences between Granite's estimate to complete vs. our partners on a particular project which occurs quite often in practice, and it could just be timing.  As an old accounting professor told me, 'the books of the world do not balance.'"

95.     However, a few weeks later during an August 2, 2019 conference call held with investors and analysts, defendant Roberts admitted that the issues that led to the $161.1 million charge were "apparent to [Granite]" by "the end of June [2019.]"  Effectively, the Individual Defendants conceded that they knew that the Company was on the verge of taking massive charges when they dismissed CFRA's concerns regarding the accounting discrepancy.

**THE INDIVIDUAL DEFENDANTS' ACCOUNTING MANIPULATION VIOLATED GAAP**

96.     The Individual Defendants accounting scheme violated GAAP in two ways: (1) prematurely including revenue from disputed claims against customers where recovery was not probable or where it was likely that a significant revenue reversal would occur; and (2) inflating the Projects' percentage of completion by ignoring the Projects' cost overruns.

97.     These improper accounting tactics resulted in Granite improperly failing to book its portion of charges arising from over $1.3 billion in joint venture-level project costs and claims comprised of:  (i) $900 million in connection with the Tappan Zee Project: (ii) at least $100 million in connection with the I-4 Project: (iii) $263 million in connection with the Rapid Bridge Project: and (iv) $25 million in connection with the IH 35 Project.  Based on the Company's equity interest in the joint ventures, the cost overruns exceeded $338 million as indicated below.

| Project | JV Cost Overruns/Claims | Granite JV Interest | Granite Share |
|---|---|---|---|
| Tappan Zee | $900 million | 23.3% | $209.7 million |
| I-4 Ultimate | $100 million ($48.1 million on behalf of SGL Constructors) | 30% | $14.4 million |
| PennDOT | $340 million[6] | 40% | $105.6 million |
| Texas | $25 million | 35% | $8.75 million |
| Total | >$1.3 billion | N/A | $338.5 million |

98.    Accounting Standards Codification ("ASC") Topic 606 ("ASC 606") governed the Company's revenue recognition during the Relevant Period.   Under ASC 606, the Company's revenue recognition was supposed to be:

$$\text{Revenue} = \text{Transaction price} \times \frac{\text{Actual costs incurred}}{\text{Total estimated costs}}$$

99.    ASC 606 defines "transaction price" as "the amount of consideration in a contract to which an entity expects to be entitled in exchange for transferring promised goods or services to a customer."   Since the Projects were based on a fixed-fee arrangement, the only way the joint ventures, and, in turn, the Company, could collect unanticipated costs are through a "change order" or a "claim," as defined in ASC 606-10-25-10.  However, state government entities were not required to pay additional costs on the sole basis of a "change order," which left the joint ventures and the Company with a significant risk of bearing unanticipated costs.  Further, the terms of the Projects required the joint ventures and the Company to "continue work on the jobs, and to recognize the associated costs regardless of whether we agree that the work we have been directed to perform is within the scope of our contracts."

100.     The American Institute of CPAs Audit and Accounting Guide for Construction Contractors provides industry-specific GAAP guidance and specifies that the transaction price "must be revised each period throughout the life of the contract when events occur and as uncertainties are resolved.  The major factors that must be considered in determining total estimated revenue include (a) the basic contract price, (b) contract options, (c) change orders, (d) claims, and (e) contract provisions for penalty and incentive payments, including award fees and performance incentives."

101.     Additionally, under ASC 606-10-32-11, companies are permitted to include unapproved claims or change orders in the transaction price "only to the extent that it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration is subsequently resolved."  In assessing the probability of a significant reversal, under ASC 606-10-32-12, "an entity shall consider both the likelihood and the magnitude of the revenue reversal."  The factors include:

> (a) The amount of consideration is highly susceptible to factors outside the entity's influence. Those factors may include volatility in a market, the judgment or actions of third parties, weather conditions, and a high risk of obsolescence of the promised good or service.
>
> (b) The uncertainty about the amount of consideration is not expected to be resolved for a long period of time.
>
> (c) The entity's experience (or other evidence) with similar types of contracts is limited, or that experience (or other evidence) has limited predictive value. . . . .

ASC 606-10-32-12.

102.     The Individual Defendants represented to investors that these standards were being followed.  For example, in a Form 10-Q filed with the SEC on May 1, 2018, the Company stated:

> Changes are made to the transaction price from unapproved change orders to the extent the amount can be reliably estimated and recovery is probable.
>
> On certain projects we have submitted and have pending unresolved contract modifications and affirmative claims ("affirmative claims") to recover additional costs and the associated profit, if applicable, to which the Company believes it is entitled under the terms of contracts with customers, subcontractors, vendors or others.  The owners or their authorized representatives and/or other third parties may be in partial or full agreement with the modifications or affirmative claims, or may have rejected or disagree entirely or partially as to such entitlement.

Changes are made to the transaction price from affirmative claims with customers to the extent it is probable that a claim settlement with a customer will result in additional revenue and the amount can be reasonably estimated.  A reduction to costs related to affirmative claims with non-customers with whom we have a contractual arrangement ("back charges") is recognized when the estimated recovery is probable and the amount can be reasonably estimated.  Except for contractual back charges, a reduction to cost related to affirmative claims against non-customers that are unrelated to jobs is recognized when the claims are settled. Recognizing affirmative claims and back charge recoveries requires significant judgments of certain factors including, but not limited to, dispute resolution developments and outcomes, anticipated negotiation results, and the cost of resolving such matters and estimates.

103.    The Individual Defendants caused Granite to violate these GAAP standards by improperly including substantial consideration from claims and disputed work in its calculation of the I-4 and Tappan Zee Projects' transaction prices, while knowing that such amounts could not be "reliably" (or "reasonably") estimated and knowing that recovery was not "probable."  These violations allowed the Individual Defendants to inflate Granite's transaction price for these Projects and prematurely recognize material amounts of revenue and profit.

104.    As to the I-4 Project, the Individual Defendants knew that receiving the $48.1 million claim from the FDOT was not probable because there was no contractual basis to allocate the risk of subsurface geotechnical issues to the FDOT.  Under the governing agreement, I-4 Mobility agreed that it would "not be entitled to any monetary compensation or time extension for any Delays or Delay impacts except with respect to Relief Event Delays."  The contract separately provided an exclusive list of "Relief Events" that could give rise to compensable "Relief Event Delays," which only included events like "FDOT-Caused Delays," "Release of Contaminated Materials by FDOT," and "Change in Law," excluding the discovery of pre-existing geotechnical issues as a viable claim. Thus, the Individual Defendants had no basis for treating any recovery for costs as "probable," let alone "reliably" or "reasonably" estimate that recovery.

105.    As to the Tappan Zee Project, the Individual Defendants also knew that receiving $900 million from the NYSTA was not probable.  TZC's agreement for the Tappan Zee Project severely limited TZC's ability to recover any cost overruns.  Pursuant to the agreement, TZC agreed that "no time extension will be allowed" for delays resulting from TZC's "inefficient operation,"

and further agreed "to make no monetary request for . . . any extra/additional costs, any delays, inefficiencies or interferences in the performance of the [Tappan Zee Project] caused by or attributable to" TZC's own inefficiencies.

106.   The Tappan Zee Project agreement also categorically excluded "non-compensable delays" for which TZC "agree[d] to make no monetary claim for . . . any extra/additional costs attributable" to those events, including delays associated with "work or the presence on the Project Site of any third party, including that of other contractors or personnel employed by the Authority," supply shortages, weather events, or any work rejected by the NYSTA as non-conforming with the agreed-upon specifications.  The agreement also forced TZC to "not maintain a Dispute for costs associated with the acceleration" of work to maintain the project's schedule absent narrow circumstances.

107.   In addition to the severely limited scenarios for cost recovery, the bases for the dispute were also not reasonable because they were stemming from adverse weather, when it was expressly agreed that costs related to the presence of NYSTA personnel at the project site and those stemming from adverse weather were unrecoverable by TZC.  TZC had issues with NYSTA's direction to accelerate the Tappen Zee Project, but TZC had not met the restrictive contractual requirements to obtain extra compensation for any accelerated work, and any purported "acceleration" was simply to maintain the Tappan Zee Project's existing schedule.  Accordingly, the Individual Defendants knew that any recovery of the $900 million in claims TZC submitted to the NYSTA could not reasonably or reliably be estimated or deemed probable because the likelihood of recovery was practically zero percent.

108.   Independently, the disputed matters met several of the risk factors under ASC 606-10-32-12 for significant revenue reversal: the amount of any consideration Granite hoped to receive was highly susceptible to the actions of third parties and other matters outside Granite's influence; the uncertainty was not expected to be resolved for a long period given the exhaustive dispute resolution procedures set forth in the contracts; and Granite had only limited experience, with limited predictive value, on similar contracts.

109.   Thus, The Individual Defendants' inclusion of substantial consideration in the transaction price for the I-4 and the Tappan Zee Projects violated:  (i) ASC 606-10-32-14 for failing to "update the estimated transaction price . . . to represent faithfully the circumstances present at the end of the reporting period and the changes in circumstances during the reporting period;" (ii) ASC 606-10-32-11 for having no basis to claim it was "probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration" was resolved; and (iii) ASC 606-10-32-12 for failing to adequately to recognize "both the likelihood and the magnitude of the revenue reversal."

110.   The Individual Defendants also manipulated Granite's financials by improperly inflating the percent complete, which is calculated by dividing actual costs incurred by total estimated costs.  Using Granite's method of accounting, revenue for each period was determined by multiplying the transaction price for a given project by Granite's then-current percent of the project that was complete: (a) actual costs incurred divided by (b) total estimated costs.

111.   As defendant Desai explained during an August 2, 2019 conference call held with investors and analysts, the "percentage of completion method calculates project revenue as a percentage of actual costs incurred divided by total estimated cost forecast on the job.   This percentage is then applied to total estimated revenue for the job to determine revenue for the period."

112.   With respect to the actual costs incurred, the Individual Defendants caused the Company to state in a Form 10-Q filed with the SEC on May 1, 2018 that:  "All contract costs, including those associated with affirmative claims, change orders and back charges, are recorded as incurred."  As to the total estimated costs, the Company stated in the same Form 10-Q that:  "The accuracy of our revenue and profit recognition in a given period depends on the accuracy of our estimates of the cost to complete each project.  Cost estimates for all of our significant projects use a detailed 'bottom up' approach, and we believe our experience allows us to create materially reliable estimates."  In the same 10-Q, the Individual Defendants also caused the Company to state that "revisions to estimated total costs are reflected as soon as the obligation to perform is determined to be probable."

113.    The determination of actual and estimated costs is subject to important constraints under ASC 606-10-25-35, which requires a company to "update its measure of progress to reflect any changes in the outcome of the performance obligation" as "circumstances change over time." Additionally, ASC 606-10-25-36 requires entities to "recognize revenue for a performance obligation satisfied over time only if the entity can reasonably measure its progress toward complete satisfaction of the performance obligation.  An entity would not be able to [do so] if it lacks reliable information that would be required to apply an appropriate method of measuring progress."

114.    Nevertheless, in violation of GAAP, the Individual Defendants ignored the Projects' known costs and excluded them from total estimated costs, which resulted in the Company's premature recognition of revenue by overstating the percentage of the Projects that were complete.

115.    Thus, the Individual Defendants caused the Company to violate ASC 606-10-25-35 for failing to properly "update its measure of progress to reflect any changes in the outcome of the performance obligation" and ASC 606-10-25-36 for failing to "reasonably measure" progress toward completion based on "reliable information."

116.    Further, as discussed in ¶¶ 79-84, the Individual Defendants removed the disclosure of a range of additional costs that were reasonably possible beginning in the fourth quarter of 2018 despite knowing the cost overruns.  This removal of the disclosure was also in violation of GAAP because ASC 450-20-50 requires disclosure of reasonably possible losses, including an "estimate of the possible loss or range of loss."  Further, the SEC has said that: "Vague or overly broad disclosures that speak merely to litigation, tax, or other risks in general, without providing any information about the specific loss contingencies being evaluated are not sufficient."

117.    As discussed above, the Individual Defendants knew that the Projects had cost overruns totaling more than $338 million.  These known facts established both the existence and amount of Granite's reasonably possible additional costs, and ASC 450 required Granite to disclose them.  No subjective judgment was required for Granite to disclose that it faced $338.5 million in additional costs in connection with the various claims the joint ventures had already threatened or asserted.  Nonetheless, after disclosing up to $45.0 million in reasonably possible additional costs in

the third quarter of 2018, Granite simply removed any disclosure in the fourth quarter of 2018, first quarter of 2019, and second quarter of 2019.  Thus, the Individual Defendants' concealment of reasonably possible additional costs was in violation of ASC 450-20-50.

**THE INDIVIDUAL DEFENDANTS CAUSE THE COMPANY TO ISSUE MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD**

118.     Throughout the Relevant Period, the Individual Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants' statements and omissions were materially false and misleading because the Company violated GAAP in failing to properly account for the Projects' substantial cost overruns, including: (1) $1.3 billion cost overruns for the Projects; (2) the Company's share of the cost overruns was at least $338.5 million; (3) the cost overruns were known to the Individual Defendants at the time they made the statements or omission; and (4) the recovery for claims associated with cost overruns was not probable, and recognizing revenue for such claims was likely to result in a significant revenue reversal.

**A.     Materially False Statements Surrounding the Company's Financial and Operational Results for the First Quarter of 2018**

119.     On April 30, 2018, the Individual Defendants held a conference call with investors and analysts to discuss the Company's financial and operational results for the first quarter of 2018. During the call, defendant Krzeminski stated that "Large Projects segment revenues increased 20% year-over-year in the first quarter to $248.4 million.  First quarter gross profit margin of 8.2% reflects nearly 700 basis points of year-over-year improvement."

120.     On May 1, 2018, the Individual Defendants caused the Company to file a Form 10-Q with the SEC ("1Q18 Form 10-Q), which was signed by defendant Krzeminski.  Defendants Roberts and Krzeminski signed certifications pursuant the Sarbanes-Oxley Act of 2002 ("SOX") attesting to compliance with Sections 13(a) or 15(d) of the Exchange Act, and stating in relevant part that the 1Q18 Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under

which such statements were made, not misleading with respect to the period covered by this report"
and that "the information contained in the report on Form 10-Q fairly presents in all material respects
the financial condition and results of operations of the Company as of and doe the periods expressed
in the report on Form 10-Q."

121.    The 1Q18 Form 10-Q stated, in relevant part:

**Large Project Construction**

The changes in project profitability from revisions in estimates, both increases and
decreases, which individually had an impact of $1.0 million or more on gross profit,
were decreases of $7.9 million and $13.0 million for the three months ended March
31, 2018 and 2017, respectively.

\*        \*        \*

As of March 31, 2018, there were four projects for which additional costs were
reasonably possible in excess of the probable amounts included in the cost forecast.
The reasonably possible aggregate range that has the potential to adversely impact
gross profit during the year ended December 31, 2018 was zero to $47.0 million.

\*        \*        \*

Large Project Construction revenue for the three months ended March 31, 2018
increased by $41.4 million, or 20.0%, when compared to 2017 primarily due to
increased beginning backlog and progress on new projects in our Heavy Civil
operating group.

\*        \*        \*

Large Project Construction gross profit for the three months ended March 31, 2018
increased by $17.8 million, or over 100%, when compared to 2017. Large Project
Construction gross profit as a percentage of segment revenue for the three months
ended March 31, 2018 increased to 8.2% from 1.2% when compared to 2017.

\*        \*        \*

During the three months ended March 31, 2018 and 2017, unconsolidated
construction joint venture net (loss) income was $(141.0) million and $8.6 million,
respectively, of which our post-adjustment share was net income of $2.6 million
and $1.5 million, respectively.

122.    The 1Q18 Form 10-Q further stated:

We recognize revenue in accordance with Topic 606.

\*        \*        \*

33

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Our profit recognition related to construction contracts is based on estimates of costs to complete each project.

\*        \*        \*

Changes are made to the transaction price from unapproved change orders to the extent the amount can be reliably estimated and recovery is probable.

\*        \*        \*

Revenue in our [Large Project Construction or Transportation] segments is ordinarily recognized over time as control is transferred to the customers by measuring the progress toward complete satisfaction of the performance obligation(s) using an input (i.e., "cost to cost") method.

\*        \*        \*

Cost estimates for all of our significant projects use a detailed "bottom up" approach, and we believe our experience allows us to create materially reliable estimates.

\*        \*        \*

When we experience significant changes in our estimates of costs to complete, we undergo a process that includes reviewing the nature of the changes to ensure that there are no material amounts that should have been recorded in a prior period rather than as revisions in estimates for the current period.

\*        \*        \*

[In our review of revisions in estimates,] we did not identify any material amounts that should have been recorded in a prior period.

\*        \*        \*

In addition to matters that are considered probable for which the loss can be reasonably estimated, disclosure is also provided when it is reasonably possible and estimable that a loss will be incurred or when it is reasonably possible that the amount of a loss will exceed the amount recorded.

123.    Additionally, as to the financial results of the unconsolidated joint ventures specifically, including those related to the Projects, the 1Q18 Form 10-Q claimed that Granite held a $415 million interest in the assets, a $182 million interest in the liabilities, and a $118 million interest in the revenue of the joint ventures as of March 31, 2018.  The Company further added that Granite's $415 million interest in the assets of the joint ventures as of March 31, 2018 included "$65 million . . . related to Granite's share of estimated cost recovery of customer affirmative claims."

124. The statements identified in ¶¶ 119-123 were materially false and misleading because:

(1) Granite's reported revenues and margins in the Large Project Construction segment were inflated by the Company's improper accounting for the Projects, which violated GAAP by inflating the Projects' transaction price and ignoring cost overruns exceeding $1.3 billion that were known to the Individual Defendants at the time;

(2) Granite's "reasonably possible aggregate range that has the potential to adversely impact gross profit during the year ended December 31, 2018" was magnitudes larger at the time than the reported range;

(3) Granite's reported improvements in revenue, gross profit, and margins in the Large Project Construction segment were predicated on the Company's improper accounting for the Projects in violation of GAAP;

(4) Granite's claimed interest in joint venture projects rested on inflation of the Projects' transaction price, which ignored cost overruns exceeding $1.3 billion that were known to the Individual Defendants;

(5) Granite violated Topic 606 by prematurely including revenue from disputed claims against customers where recovery was not probable or where it was likely that a significant revenue reversal would occur and inflating the Projects' percentage of completion by ignoring the Projects' known cost overruns;

(6) Granite improperly inflated the Projects' transaction price by including substantial consideration from claims against customers on the I-4 and Tappan Zee Projects, while knowing in each case that recovery was not "probable" and/or "estimable;"

(7) Granite improperly inflated the Projects' transaction price by including substantial consideration from unapproved change orders from which recovery was not "probable" and/or the amount could not be "reliably estimated;"

(8) Granite manipulated and overstated its percentage of completion for the Projects, such that Granite's revenue recognition did not properly reflect "progress toward complete satisfaction of the performance obligation(s)" or the transfer of control to Granite's customers;

(9) Granite did not update its estimated total costs "as soon as the obligation to perform is determined," but instead ignored known cost overruns to prematurely recognize revenue and overstate profits;

(10) Granite did not determine estimated total costs with a "detailed 'bottom up' approach," and did not seek to "create materially reliable estimates," but instead ignored known cost overruns to prematurely recognize revenue and overstate profits;

(11) Granite did not properly ensure that "there are no material amounts that should have been recorded in a prior period," but instead ignored known cost overruns to prematurely recognize revenue and overstate profits;

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

(12) Granite intentionally ignored "material amounts that should have been recorded in a prior period," by ignoring known cost overruns to prematurely recognize revenue and overstate profits; and

(13) Granite failed to disclose at least $338.5 million in known "additional cost" overruns and, in 4Q18 and 1Q and 2Q19, failed to disclose any "reasonably possible" cost overruns, in violation of GAAP and the Company's stated accounting policies."

**B.    Materially False Statements Surrounding the Company's Financial and Operational Results for the Second Quarter of 2018**

125.    On August 8, 2018, the Individual Defendants held a conference call with investors and analysts to discuss the Company's financial and operational results for the second quarter of 2018. During the call, defendant Roberts stated that "Rounding our operational performance review, we look now to the Large Project Construction segment, which produced steady revenue improvement and modestly improved second quarter profit performance from last year."

126.    On the same call, defendant Desai added that "Large Project Segment revenues increased 7.7% year-over-year in the second quarter to $273.9 million with segment gross profit and margin both finishing slightly better than last year."

127.    On August 8, 2018, the Individual Defendants caused the Company to file a Form 10-Q with the SEC ("2Q18 Form 10-Q"), which was signed by defendant Desai. Defendants Roberts and Desai signed certifications pursuant to SOX substantially similar to those described in ¶ 120.

128.    The 2Q18 Form 10-Q stated, in relevant part:

**Large Project Construction**

The changes in project profitability from revisions in estimates, both increases and decreases, which individually had an impact of $1.0 million or more on gross profit, were net decreases of $30.3 million and $39.8 million for the three and six months ended June 30, 2018, respectively. The changes for the three and six months ended June 30, 2017 were decreases of $23.8 million and $37.8 million, respectively.

*          *          *

As of June 30, 2018, there were three projects for which additional costs were reasonably possible in excess of the probable amounts included in the cost forecast. The reasonably possible aggregate range that has the potential to adversely impact gross profit during the year ended December 31, 2018 was zero to $15.0 million.

*          *          *

Large Project Construction revenue for the three and six months ended June 30, 2018 increased by $19.5 million, or 7.7%, and $60.9 million, or 13.2%,

respectively, when compared to 2017 primarily due to increased beginning backlog and progress on new projects in our Heavy Civil operating group.

\* \* \*

Large Project Construction gross profit for the three and six months ended June 30, 2018 increased by $0.8 million, or over 100%, and $18.7 million, or over 100%, respectively, when compared to 2017. Large Project Construction gross profit as a percentage of segment revenue for the three and six months ended June 30, 2018 increased to 0.5% from 0.2% and from 0.7% to 4.2%, respectively, when compared to 2017.

\* \* \*

During the three and six months ended June 30, 2018, unconsolidated construction joint venture net income (loss) was $26.5 million and ($114.4) million, respectively, of which our post-adjustment share were net losses of ($17.7) million and ($13.4) million, respectively. During the three and six months ended June 30, 2017, unconsolidated construction joint venture net income was $17.6 million and $26.2 million, respectively, of which our post-adjustment share were net losses of ($9.7) million and ($8.2) million, respectively.

129.    The 2Q18 Form 10-Q went on to repeat the statements listed in ¶ 122:

130.    Additionally, as to the financial results of the unconsolidated joint ventures specifically, including those related to the Projects, the 2Q18 Form 10-Q claimed that Granite held a $431 million interest in the assets, a $193 million interest in the liabilities, and a $110 million interest in the revenue of the joint ventures as of June 30, 2018.  The Company further added that Granite's $431 million interest in the assets of the joint ventures as of March 31, 2018 included "$65.8 million . . . related to Granite's share of estimated cost recovery of customer affirmative claims."

131.    The statements identified in ¶¶ 125-130 were materially false and misleading because:

(1) Granite's reported revenues and margins in the Large Project Construction segment were inflated by the Company's improper accounting for the Projects, which violated GAAP by inflating the Projects' transaction prices and ignoring cost overruns exceeding $1.3 billion that were known to the Individual Defendants at the time;

(2) Granite's reported net decrease to project profitability during the three months ended June 30, 2018 rested on Granite's improper accounting for the Projects;

(3) Granite's "reasonably possible aggregate range that has the potential to adversely impact gross profit during the year ended December 31, 2018" was magnitudes larger at the time than the reported range;

(4) Granite's reported improvements in revenue, gross profit, and margins in the Large Project Construction segment were predicated on the Company's improper accounting for the Projects in violation of GAAP;

(5) Granite's claimed interest in joint venture projects rested on inflation of the Projects' transaction prices, which ignored cost overruns exceeding $1.3 billion that were known to the Individual Defendants;

(6) Granite violated Topic 606 by prematurely including revenue from disputed claims against customers where recovery was not probable or where it was likely that a significant revenue reversal would occur and inflating the Projects' percentage of completion by ignoring the Projects' known cost overruns;

(7) Granite improperly inflated the Projects' transaction price by including substantial consideration from claims against customers on the I-4 and Tappan Zee Projects, while knowing in each case that recovery was not "probable" and/or "estimable";

(8) Granite improperly inflated the Projects' transaction price by including substantial consideration from unapproved change orders from which recovery was not "probable" and/or the amount could not be "reliably estimated;"

(9) Granite manipulated and overstated its percentage of completion for the Projects, such that Granite's revenue recognition did not properly reflect "progress toward complete satisfaction of the performance obligation(s)" or the transfer of control to Granite's customers;

(10) Granite did not update its estimated total costs "as soon as the obligation to perform is determined," but instead ignored known cost overruns to prematurely recognize revenue and overstate profits;

(11) Granite did not determine estimated total costs with a "detailed 'bottom up' approach," and did not seek to "create materially reliable estimates," but instead ignored known cost overruns to prematurely recognize revenue and overstate profits;

(12) Granite did not properly ensure that "there are no material amounts that should have been recorded in a prior period," but instead ignored known cost overruns to prematurely recognize revenue and overstate profits;

(13) Granite intentionally ignored "material amounts that should have been recorded in a prior period," by ignoring known cost overruns to prematurely recognize revenue and overstate profits; and

(14) Granite failed to disclose at least $338.5 million in known "additional cost" overruns and, in 4Q18, 1Q19, and 2Q19, failed to disclose any "reasonably possible" cost overruns, in violation of GAAP and the Company's stated accounting policies."

**C.    Materially False Statements Surrounding the Company's Financial and Operational Results for the Third Quarter of 2018**

132.    On October 26, 2018, the Individual Defendants held a conference call with investors and analysts to discuss the Company's financial and operational results for the third quarter of 2018. During the call, defendant Desai stated:   "In the third quarter, Transportation segment revenue

decreased 2.2% year-over-year to $610.8 million.  On a year-to-date basis, segment revenue has increased 3.5% from 2017 to $1.47 billion.  Quarterly gross profit increased 8.3% year-over-year with gross profit margin of 11.6%, up more than 100 basis points from last year.  Year-to-date gross profit increased 15.4% with a resulting gross profit margin of 9.4%, up about 100 basis points from 2017."

133.    On October 29, 2018, the Individual Defendants caused the Company to file a Form 10-Q with the SEC ("3Q18 Form 10-Q"), which was signed by defendant Desai.  Defendants Roberts and Desai signed certifications pursuant to SOX substantially similar to those described in ¶ 120.

134.    The 3Q18 Form 10-Q stated, in relevant part:

The changes in project profitability from revisions in estimates, which individually had an impact of $5.0 million or more on gross profit, were decreases of $19.3 million and $57.8 million for the three and nine months ended September 30, 2018, respectively.

*        *        *

As of September 30, 2018, there were four projects for which additional costs were reasonably possible in excess of the probable amounts included in the cost forecast. The reasonably possible aggregate range that has the potential to adversely impact gross profit is zero to $45.0 million.

*        *        *

Transportation revenue for the three and nine months ended September 30, 2018 decreased by $13.9 million, or 2.2%, and increased by $49.3 million, or 3.5%, respectively, when compared to 2017.

*        *        *

Transportation gross profit for the three and nine months ended September 30, 2018 increased by $5.4 million, or 8.3%, and $18.5 million, or 15.4%, respectively, when compared to 2017.

*        *        *

During the three and nine months ended September 30, 2018, unconsolidated construction joint venture net losses were $(47.6) million and ($162.0) million, respectively, of which our post-adjustment share were net losses of ($3.1) million and ($16.5) million, respectively. During the three and nine months ended September 30, 2017, unconsolidated construction joint venture net income was $31.0 million and $57.2 million, respectively, of which our post-adjustment share were net losses of ($7.1) million and ($15.3) million, respectively.

135.   The 3Q18 Form 10-Q went on to repeat the statements listed in ¶ 122.

136.   Additionally, as to the financial results of the unconsolidated joint ventures specifically, including those related to the Projects, the 3Q18 Form 10-Q claimed that Granite held a $442 million interest in the assets, a $180 million interest in the liabilities, and a $151 million interest in the revenue of the joint ventures as of September 30, 2018.  The Company further added that Granite's $442 million interest in the assets of the joint ventures as of March 31, 2018 included "$67.1 million . . . related to Granite's share of estimated cost recovery of customer affirmative claims."

137.   The statements identified in ¶¶ 132-136 were materially false and misleading for reasons stated in ¶ 131(1), (3)-(14) and because Granite's reported net decrease to project profitability during the three months ended June 30, 2018 rested on Granite's improper accounting for the Projects.

**D.   Materially False Statements Surrounding the Company's Financial and Operational Results for the Fourth Quarter of 2018 and 2018 Annually**

138.   On February 20, 2019, the Individual Defendants held a conference call with investors and analysts to discuss the Company's financial and operational results for the fourth quarter of 2018 and 2018 annually. During the call, defendant Desai stated:

> In the fourth quarter Transportation segment revenue decreased 3.8% year-over-year to $504 million. In spite of the late year drag, full-year segment revenue increased to $1.98 billion, up 1.5% from last year.
>
> Quarterly gross profit increased 2.8% year-over-year with a gross profit margin of 10.2%, up 66 basis points from last year. We created solid leverage in this segment with the gross profit increasing 11.7% in 2018 and the gross profit margin up 88 basis points year-over-year to 9.6%.

139.   On February 22, 2019, the Individual Defendants caused the Company to file a Form 10-K with the SEC ("2018 Form 10-K"), which was signed by defendants Desai, Bjork, Roberts, Bradford, Darnell, Galloway, Lyash, Krusi, Kelsey, Mastin, McNally, and Vasquez.  Defendants Roberts and Desai signed certifications pursuant to SOX substantially similar to those described in ¶ 120.

140.   The 2018 Form 10-K stated, in relevant part:

The changes in project profitability from revisions in estimates, which individually had an impact of $5.0 million or more on gross profit, were decreases of $86.5 million, $67.2 million and a net decrease of $33.0 million for the years ended December 31, 2018, 2017 and 2016, respectively.

*        *        *

Included in the tables above for the years ended December 31, 2018, 2017 and 2016 is the impact to gross profit from changes in estimated contract revenue and costs of $18.2 million, $34.3 million and $51.3 million, respectively, related to revisions in estimates from the estimated cost recovery of customer affirmative claims and back charges. Generally, increases in estimated contract costs are in excess of estimated cost recovery from affirmative claims and back charges.

*        *        *

Transportation revenue in 2018 increased $29.3 million, or 1.5%, compared to 2017 due to entering the year with greater contract backlog in the Heavy Civil, California and Midwest operating groups as well as improved success rate on bidding activity in the California and Midwest groups.

*        *        *

Transportation gross profit for the year ended December 31, 2018 increased by $19.9 million, or 11.7%, when compared to 2017 primarily due to increased revenue volume and margin improvement in our California operating group due to an increase in highway rehabilitation work partially offset by a decline in our Northwest operating group from reduced revenue volume and in our Heavy Civil operating group from a net negative impact from revisions in estimates (see Note 3 of "Notes to the Consolidated Financial Statements" for more information). Transportation gross margin as a percentage of segment revenue for 2018 increased to 9.6% from 8.7% in 2017.

*        *        *

During the years ended December 31, 2018, 2017 and 2016, unconsolidated construction joint venture net (loss) income was ($240.3) million, $62.2 million and $41.8 million, respectively, of which our share was ($22.6) million, ($14.4) million and $15.6 million, respectively.

141.    The 2018 Form 10-K went on to repeat the statements listed in ¶ 122.

142.    Additionally, as to the financial results of the unconsolidated joint ventures specifically, including those related to the Projects alleged above, the 2018 Form 10-K claimed that Granite held a $426 million interest in the assets, a $155 million interest in the liabilities, and a $155 million interest in the revenue of the joint ventures for the year ended December 31, 2018.  The Company further added that Granite's $426 million interest in the assets of the joint ventures as of

March 31, 2018, included "$78.1 million . . . related to Granite's share of estimated cost recovery of customer affirmative claims."

143.    Further, the 2018 Form 10-K omitted any disclosure of projects for which additional costs were reasonably possible, or the reasonably possible aggregate range of such additional costs, contrary to GAAP's disclosure requirement.  This material omission violated ASC 450 and was materially false and misleading because it falsely suggested to investors that no further costs were reasonably possible, and no charges were being contemplated.  In reality, Granite's reasonably possible aggregate range of additional costs included cost overruns of at least $338.5 million.

144.    The statements identified in ¶¶ 138-143 were materially false and misleading for the reasons stated in ¶ 131(1), (4)-(14) and because Granite's reported net decrease to project profitability for the year ended December 31, 2018 rested on Granite's improper accounting for the Projects and the Form 10-K omitted any disclosure of projects for which additional costs were reasonably possible, or the reasonably possible aggregate range of such additional costs, contrary to GAAP's disclosure requirement.

**E.    Materially False Statements Surrounding the Company's Financial and Operational Results for the First Quarter of 2019**

145.    On April 26, 2019, the Individual Defendants held a conference call with investors and analysts to discuss the Company's financial and operational results for the first quarter of 2018. During the call, defendant Desai stated that "Transportation segment revenues declined about 6%, with weather headwinds, especially in California, the largest driver of the revenue and of the year-over-year margin decrease to 6.3%."

146.    On April 26, 2019, the Individual Defendants caused the Company to file a Form 10-Q with the SEC, which stated, in relevant parts:

> The changes in project profitability from revisions in estimates including estimated cost recovery of customer affirmative claims and back charges, which individually had an impact of $5.0 million or more on gross profit, were decreases of $5.7 million and $5.3 million for one project during each of the three months ended March 31, 2019 and 2018, respectively.

*       *       *

Transportation revenue for the three months ended March 31, 2019 decreased by $20.9 million, or 5.8%, when compared to 2018.

\* \* \*

Transportation gross profit for the three months ended March 31, 2019 decreased by $10.2 million, or 32.5%, when compared to 2018.

147. Additionally, as to the financial results of the unconsolidated joint ventures specifically, including those related to the Projects above, the Form 10-Q claimed that Granite held a $458 million interest in the assets, a $160 million interest in the liabilities, and a $131 million interest in the revenue of the joint ventures as of March 31, 2019. The Company further added that Granite's $458 million interest in the assets of the joint ventures as of March 31, 2019, included "$80.8 million . . . related to Granite's share of estimated cost recovery of customer affirmative claims."

148. Further, the Form 10-Q omitted any disclosure of projects for which additional costs were reasonably possible, or the reasonably possible aggregate range of such additional costs, contrary to GAAP's disclosure requirement. This material omission violated ASC 450 and was materially false and misleading because it falsely suggested to investors that no further costs were reasonably possible, and no charges were being contemplated. In reality, Granite's reasonably possible aggregate range of additional costs included cost overruns of at least $338.5 million.

149. The statements identified in ¶¶ 145-148 were materially false and misleading for the reasons stated in ¶124(1), (4)-(5) and because Granite's reported net decrease to project profitability for the three months ended March 31, 2019 and 2018, respectively, rested on Granite's improper accounting for the Projects and the Form 10-Q omitted any disclosure of projects for which additional costs were reasonably possible, or the reasonably possible aggregate range of such additional costs, contrary to GAAP's disclosure requirement.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**F.      Materially False Statements Surrounding the Company's Financial and Operational Results for the Second Quarter of 2019**

150.     On August 2, 2019, the Individual Defendants held a conference call with investors and analysts to discuss the Company's financial and operational results for the first quarter of 2018. During the call, defendant Desai stated:

> Second quarter 2019 results included non-cash pre-tax charges of $143.7 million or $106.7 million after tax. These costs are reflected in the transportation segment with both a reduction of revenue of $114.2 million, and increased cost of $29.5 million.
>
> . . . In the second quarter, transportation segment revenue was $404 million, which includes the reduction in revenue of $114.2 million.
>
> On a year-to-date basis, revenue was $742.2 million including the revenue reduction down from $861.9 million last year. Quarterly gross loss of $99.9 million include charges compared to gross profit of $36 million in the prior year. On a year-to-date basis, gross loss was $78.6 million compared to gross profit of $67.4 million in the prior year

151.     During the same call, in response to a question regarding Granite's large projects, defendant Roberts stated:

> We also believe that we have covered our current challenges and future risks in the heavy civil group adjustments that we made in those four legacy projects that we announced on Monday . . . .  And I don't see significant costs.  But of course, there will be some as we move forward.  But we have embedded that.

152.     On August 6, 2019, the Individual Defendants caused the Company to file a Form 10-Q with the SEC ("1Q19 Form 10-Q"), which was signed by defendant Desai.  Defendants Roberts and Desai signed certifications pursuant to SOX substantially similar to those described in ¶ 120.

153.     The 1Q19 Form 10-Q stated, in relevant part:

> For the three and six months ended June 30, 2019, revisions in estimates, including estimated cost recovery of customer affirmative claims and back charges, that individually had an impact of $5.0 million or more on gross profit resulted in decreases to gross profit and loss before (benefit from) provision for income taxes of $161.1 million and $167.8 million, respectively, and decreases in net loss of $120.2 million and $125.4 million ($2.57 and $2.68 per share), respectively.
>
> *      *      *
>
> Transportation revenue for the three and six months ended June 30, 2019 decreased by $98.7 million, or 19.6%, and $119.7 million, or 13.9%, respectively, when compared to 2018.
>
> *      *      *

44

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

> Transportation gross loss for the three and six months ended June 30, 2019 increased by $135.8 million, or over 100%, and $146.1 million, or over 100%, respectively, when compared to 2018.

*        *        *

> During the three and six months ended June 30, 2019, unconsolidated construction joint venture net loss was $(18.9) million and $(13.7) million, respectively, of which our share was net loss of $(106.3) million and $(105.8) million, respectively. During the three and six months ended June 30, 2018, unconsolidated construction joint venture net income (loss) was $26.5 million and $(114.4) million, respectively.

154.    Additionally, as to the financial results of the unconsolidated joint ventures specifically, including those related to the Projects, the 1Q19 Form 10-Q claimed that Granite held a $470 million interest in the assets, a $287 million interest in the liabilities, and a $144 million interest in the revenue of the joint ventures as of March 31, 2019.  The Company further added that Granite's $470 million interest in the assets of the joint ventures as of June 30, 2019, included "$89.4 million . . . related to Granite's share of estimated cost recovery of customer affirmative claims."

155.    Further, the 1Q19 Form 10-Q omitted any disclosure of projects for which additional costs were reasonably possible, or the reasonably possible aggregate range of such additional costs, contrary to GAAP's disclosure requirement.  This material omission violated ASC 450 and was materially false and misleading because it falsely suggested to investors that no further costs were reasonably possible, and no charges were being contemplated.  In reality, Granite's reasonably possible aggregate range of additional costs included cost overruns of at least $338.5 million.

156.    The statements identified in ¶¶ 150-155 were materially false and misleading for the reasons stated in ¶ 131(1), (4)-(5) and because Granite's reported net decrease to project profitability for the three months and six months ended June 30, 2019, respectively, rested on Granite's improper accounting for the Projects and the Form 10-Q omitted any disclosure of projects for which additional costs were reasonably possible, or the reasonably possible aggregate range of such additional costs, contrary to GAAP's disclosure requirement.

157.    Additionally, in Granite's Forms 10-Q and 10-K filed during the Relevant Period, in the section titled "Controls and Procedures," defendants Roberts, Krzeminski, and Desai affirmed that they had conducted an evaluation of "the effectiveness of our disclosure controls and

procedures" under the Exchange Act, and that Granite's "disclosure controls and procedures were effective . . . ." In addition, as noted, the Forms 10-Q and 10-K contained SOX certifications signed by defendants Roberts, Krzeminski, and Desai attesting to the Form's accuracy with respect to the financial reporting and the disclosure of all fraud.

158.   These statements regarding the Company's disclosure controls were false and misleading because contrary to their SOX certifications, defendants Roberts, Krzeminski, and Desai knew that the Forms contained false and/or misleading statements of material fact and that the financial statements and other financial information included in the Forms violated GAAP and did not fairly present in all material respects the financial condition and results of operations of the Company during the Relevant Period.

**THE TRUTH BEGINS TO EMERGE**

159.   On July 29, 2019, Granite reported preliminary results for its second quarter of 2019 and announced that it had incurred after-tax charges ranging between $104-$108 million for all four of the Projects—ultimately resulting in a pre-tax charge of $143.7 million. According to Granite, the charges stemmed from cost overruns, which were exacerbated by schedule delays, execution of a significant amount of disputed work, and a recent unfavorable court ruling on a project dispute.

160.   On August 2, 2019, the Company reported results for its second quarter of 2019 and announced that it was forced to take a $143.7 million pre-tax charge ($106.7 million after tax). Granite confirmed that the charge was driven by four projects bid between 2012 and 2014 that were each over $1 billion in value, in an unconsolidated joint venture, subject to a fixed-price design build contract, and for which Granite was a minority partner. The I-4 Project, Tappan Zee Project, PennDOT Project, and Texas Project are the only four projects that satisfy those criteria. This $143.7 million pre-tax charge is roughly eight times larger than the average quarterly charge that Granite recognized in the Transportation or Large Project Construction segments in prior quarters during the Relevant Period.

161.   Granite falsely attempted to blame the charge on recent events and unanticipated costs. According to Roberts, "Through our quarterly project review and estimate to complete

updates, our teams reported in late June that they had experienced increased project completion costs

in the second quarter of 2019."  Desai similarly attempted to falsely blame the charge on "significant

unanticipated project costs."

162.    Neither Roberts nor Desai, however, attempted to explain how four unrelated projects

in four different states with different joint venture partners that the Company repeatedly stated were

nearly complete after years of construction, could all have incurred massive, unexpected charges in

the same three-month period.

163.    Analysts were surprised.  On the Company's August 2, 2019 earnings call for the

second quarter of 2019, an analyst from Goldman Sachs asked:  "Can you give us a rough

understanding out of the project write-downs this quarter, what proportion of that was to the single

project, that's only 60% complete versus the other three that are over 90% complete?  And can you

say more about your review process this quarter and what triggered the review?  I certainly

understand the comments on rainfall and litigation, but this is a really big adjustment and presumably

you were contemplating making the adjustment last quarter to some extent, because I don't think I

saw any big catalysts this quarter outside the litigation so maybe can you talk about your process

there as well."  Roberts parried in response, stating that the Company would not talk about individual

projects.  The Goldman Sachs analyst then insisted, stating, "the implications for the stock are really

different if a big chunk of the charges comes from a project that's only two-thirds complete versus

the ones that are scheduled to reach completion this year."  Roberts answered that the issues were

"cumulative in these four projects" and that Granite uncovered the cost overruns from performing

"standard protocol issues that we are doing every quarter on these large projects."

164.    Jarred by the magnitude of the charge, during the same call, an analyst from Cowen

asked:  "And then what gives you comfort that the current projects don't need to be adjusted further?

Or do you feel like the write-downs and everything that's been taken is enough to cover anything

that might pop up in the future?"  Roberts' response was categorical and affirmative:  "Yes.  We're

confident that we have covered the current challenges and future risks in the forecast, that we have

provided for not just the four legacy projects, but for all our work."  According to Roberts, Granite

had "covered our current challenges and future risks in the heavy civil group adjustments that we made in those four legacy projects that we announced."

165.    Roberts' statements were quickly revealed to be false.  On October 25, 2019, Granite announced results for the third quarter of 2019 and reported another $69.3 million loss in its Heavy Civil Group, which was driven by an $80.7 million decrease to project profitability on the Projects (on top of the $161.1 million decrease in the prior quarter).  Granite claimed that this loss and decrease to project profitability resulted from increased project completion costs, schedule delays, lower productivity, and performance of a significant amount of disputed work—the same types of issues that had long plagued the Projects and drove the charge announced just three months before.

166.    At the same time, Granite announced that it had terminated Dale A. Swanberg, Senior Vice President and Large Projects Group Manager, who had been charged with overseeing the Projects.

167.    Analysts were surprised and not pleased given Roberts' categorical statements in the prior quarter that Granite had already booked all necessary charges.  Cowen issued a report dated October 25, 2019 stating that the continued losses in Granite's Heavy Civil Group were "Hurting Credibility" given that it had been "under the impression most of this was absorbed last [quarter]."  As a result of these corrective disclosures, the price of Granite's stock went from $44.47 prior to the initial corrective disclosure on July 29, 2019, to $26.25 on October 24, 2019.

**THE INDIVIDUAL DEFENDANTS CAUSE THE COMPANY TO REPURCHASE SUBSTANTIAL AMOUNTS OF GRANITE STOCK AT ARTIFICIALLY INFLATED PRICES**

168.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations.

169.    On April 7, 2016, Granite announced that its Board had authorized the Company to purchase up to $200 million of its common stock at management's discretion (the "2016 Repurchase Plan").

170.    According to the Form 10-Q that Granite filed with the SEC on April 29, 2020, "The specific timing and amount of any future purchases will vary based on market conditions, securities law limitations and other factors."

171.    According to Granite's own Forms 10-K and 10-Q filed with the SEC, Granite did not make any stock repurchases under the 2016 Repurchase Plan prior to the Relevant Period.

172.    In late 2018, however, during the Relevant Period, Granite's management began to repurchase Granite stock pursuant to the 2016 Repurchase Plan.

173.    According to the Form 10-K Granite filed with the SEC on February 22, 2019, the Company spent $9,999,971 to acquire 252,072 shares of Granite common stock, implying a price of approximately $39.67 per share.

174.    Through the repurchases, the Individual Defendants falsely signaled to the market that they believed Granite shares were undervalued and that the repurchases were the best use of Granite's cash.  In reality, given when management caused the Company to repurchase its own stock—during the Relevant Period—the Company vastly overpaid for its own stock as a result of acquiring artificially overvalued stock.  Specifically, the $39.67 per share was far greater than the $26.25 per share that Granite stock was worth after the fraud was revealed.  Accordingly, Granite was harmed by at least $3,383,081, the total difference between the repurchase value and the post-revelation share value.

## DAMAGES TO THE COMPANY

175.    As a result of the Individual Defendants' wrongful conduct, Granite disseminated false and misleading statements and omitted material information to make such statements false and misleading when made.  The improper statements have devastated Granite's credibility.  Granite has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

176.    As a result of the Individual Defendants' misconduct, Granite has sustained damages, including, but not limited to, costs and expenses incurred from having to defend and possibly settle the Securities Class Action.

177.    As a direct and proximate result of the Individual Defendants' actions as alleged above, Granite's market capitalization has been substantially damaged, losing almost a billion dollars in value as a result of the conduct described herein.  Specifically, Granite's share price increased to a high of $48.18 on the Individual Defendants' false and misleading statements in connection with the Company's third quarter results, only to fall to a share price of $26.25 on October 24, 2019, when the truth about Granite's business was revealed by the Individual Defendants.

178.    Moreover, these actions have irreparably damaged Granite's corporate image and goodwill.  For at least the foreseeable future, Granite will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Granite's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

179.    Plaintiff brings this action derivatively for the benefit of the Company to redress injuries suffered and to be suffered as a proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law.

180.    Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

181.    Plaintiff is an owner of Granite common stock and was an owner of Granite common stock at all times relevant hereto.

182.    At the time this action was commenced, the Board consisted of the twelve Director Defendants.  Because of the facts set forth throughout this Complaint, at least eight of the twelve defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action and so demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**DEMAND IS FUTILE AS TO ALL DIRECTOR DEFENDANTS BECAUSE THE DIRECTOR DEFENDANTS FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

183.   The Director Defendants face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were directors throughout the time of the false and misleading statements referenced above, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate.

184.   Moreover, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, the Director Defendants knowingly and/or with reckless disregard reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially-inflated prices and misrepresented the financial health of Granite.

185.   The Director Defendants' making or authorization of these false and misleading statements, failure to timely correct such statements, failure to recognize revenue for certain transactions, failure to take necessary and appropriate steps to ensure that the Company's internal controls over financial reporting were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of fiduciary duties and have resulted in the Director Defendants facing a substantial likelihood of liability as, unbeknownst to investors, Granite was incapable of meeting its fiscal year 2020 revenue outlook as represented by the Director Defendants.

186.   In addition, the Director Defendants face a substantial likelihood of liability for breaching their fiduciary duties by making or authorizing the false and misleading statements that inflated the Company's stock price and then permitting the repurchase of over $10 million worth of Granite stock at an inflated price.

187.    If the Director Defendants were to bring a suit on behalf of Granite to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason, demand is futile.

**THE AUDIT COMMITTEE DEFENDANTS ARE NOT DISINTERESTED AS THEY FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

188.    The Audit Committee Defendants were members of the Audit Committee at the time the Company lacked proper internal controls and the improper statements detailed herein were issued.  Pursuant to the Audit Committee's Charter, the members of the Audit Committee were and are responsible for, *inter alia*, reviewing the Company's financial reports, the Company's business and financial risk management practices, the Company's legal and regulatory compliance, and the integrity of the Company's financial statements and internal controls.  Notably, in performing these duties, the Audit Committee Defendants were required to discuss with management and the Company's independent auditor the annual financial statements and all SEC filings before they were filed.  The Audit Committee Defendants breached their fiduciary duties by allowing the Company to make the improper statements discussed above.  The Audit Committee Defendants each face a substantial likelihood of liability for their breaches of fiduciary duties, and, therefore, any demand upon them is futile.

**DEMAND IS FUTILE AS TO DEFENDANT ROBERTS**

189.    Defendant Roberts lacks independence for purposes of demand futility because his principal occupation is President and CEO of Granite.  As such, the DEF 14A filed by the Company with the SEC on April 23, 2019 (the "2019 Proxy") admits that Roberts is not independent.  According to the 2019 Proxy, in 2019, Roberts received total compensation of $4,126,623 and this amount is material to him.  Further, Roberts is incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Action.

**COUNT I**
**Against the Individual Defendants**
**for Breach of Fiduciary Duty**

190.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

191.    The Individual Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligations of good faith, fair dealing, loyalty, and due care.

192.    The Individual Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants knowingly inflated the Company's revenue, income, and margins in violation of GAAP, which rendered Granite's financial results issued during the Relevant Period materially false and misleading.

193.    Moreover, the Individual Defendants willfully ignored the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

194.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Granite has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

195.    Plaintiff, on behalf of Granite, has no adequate remedy at law.

**COUNT II**
**Against the Individual Defendants**
**for Unjust Enrichment**

196.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

197.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Granite.  The Individual Defendants were unjustly enriched by their receipt of compensation while breaching fiduciary duties owed to Granite.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

198.   Plaintiff, as a stockholder and representative of the Company, seeks restitution from the Individual Defendants, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants, and each of them, as a result of their wrongful conduct and fiduciary breaches.

199.   Plaintiff, on behalf of Granite, has no adequate remedy at law.

**COUNT III**
**Against the Individual Defendants**
**Under Section 10(b) of the Exchange Act and Rule 10b-5**

200.   Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

201.   The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Granite. Not only is Granite now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also a victim of the unlawful scheme perpetrated upon Granite by the Individual Defendants.  With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase $10 million of its own shares at artificially-inflated prices, damaging Granite.

202.   During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

203.   The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Granite not misleading.

204.   The Individual Defendants, as officers and directors of the Company, are liable as direct participants in the wrongs complained of herein.   Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Granite.   The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.   The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

205.   In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, each made and/or signed the Company's Form 10-Ks and 10-Qs filed with the SEC during the Relevant Period.

206.   By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

**COUNT IV**
**Against the Individual Defendants**
**Under Section 20(a) of the Exchange Act**

207.   Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

208.   The Individual Defendants, by virtue of their positions with Granite and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Granite within the meaning of Section 20(a) of the Exchange Act.   The Individual Defendants had the power and influence and exercised the same to cause Granite to engage in the illegal conduct and practices complained of herein.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of Granite and that Plaintiff is a proper and adequate representative of the Company;

B.    Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, unjust enrichment, and violations of the federal securities laws;

C.    Directing Granite to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Granite and its stockholders from a repeat of the damaging events described herein, including, but not limited to,

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;
- strengthening the Company's internal reporting and financial disclosure controls;
- developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and
- strengthening the Company's internal operational control functions

D.    Awarding to Granite restitution from the Individual Defendants, and each of them;

E.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: May 6, 2020                                   Respectfully Submitted,

**BRAGAR EAGEL & SQUIRE, P.C.**


/s/ *W. Scott Holleman*
W. Scott Holleman (SBN 310266)
Melissa A. Fortunato (SBN 319767)
101 California Street, Suite 2710
San Francisco, California 94111
Telephone:  (415) 365-7149
Email:  holleman@bespc.com
            fortunato@bespc.com

*Counsel for Plaintiff*

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT